## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| JOSHUA DEBERNARDIS, individually and on behalf of all others similarly situated, | )<br>)<br>) |
| Plaintiff, | ) Case No. |
| v. | ) |
| NBTY, INC., and UNITED STATES NUTRITION, INC. | ) **JURY TRIAL DEMANDED** |
| Defendants. | ) |

## CLASS ACTION COMPLAINT

Plaintiff Joshua DeBernardis ("Plaintiff"), through his undersigned attorneys, Siprut PC and Barbat, Mansour & Suciu PLLC, brings this Class Action Complaint against Defendants NBTY, Inc., and United States Nutrition, Inc. (collectively, the "Defendants"), individually and on behalf of all others similarly situated, and complains and alleges upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys:

## NATURE OF THE ACTION

1. This is a civil class action brought individually by Plaintiff on behalf of all consumers who purchased the dietary supplement Body Fortress 100% Pure Glutamine Powder (the "Product") from Defendants.

2. Defendants advertise, manufacture, market, sell and distribute the Product throughout the United States, including in the State of Illinois.

3. Defendants make numerous false and misleading claims on the label of their Product. These false and misleading claims include, but are not limited to, statements relating to the beneficial effects of glutamine.

4. Plaintiff and each of the Class members accordingly suffered an injury in fact caused by the false, fraudulent, unfair, deceptive, and misleading practices set forth herein, and seek compensatory damages and injunctive relief.

## JURISDICTION AND VENUE

5. This Court has original jurisdiction over this controversy pursuant to 28 U.S.C. § 1332(d), Plaintiff's claims and the claims of the other members of the Class exceed $5,000,000 exclusive of interest and costs, and there are numerous Class members who are citizens of states other than Defendants' states of citizenship.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (c) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District and because Defendants transact business and/or have agents within this District.

## PARTIES

7. Plaintiff Joshua DeBernardis is a citizen of Illinois who resides in Grayslake, Illinois. Plaintiff DeBernardis purchased Body Fortress 100% Pure Glutamine Powder for his own use from Walmart in Round Lake Beach, Illinois.

8. NBTY, Inc. is licensed in the state of Delaware, with a principal place of business located at 2100 Smithtown Avenue, Ronkonkoma, New York 11779. Upon information and belief, NBTY, Inc. has a controlling interest in Defendant United States Nutrition, Inc.

9. Defendant NBTY, Inc. ("NBTY") is the parent company of Defendant United States Nutrition, Inc.

10. United States Nutrition, Inc. is licensed in the state of Delaware, with a principal place of business located at 90 Orville Drive, Bohemia, New York 11716. Upon information and belief, United States Nutrition, Inc. is a subsidiary of Defendant NBTY, Inc.

## FACTUAL ALLEGATIONS

### *Overview Of Glutamine*

11. Defendants' Product is generally categorized as an "L-Glutamine" product.

12. L-Glutamine ("L-Glutamine" and "Glutamine" as used herein are synonymous) is a naturally-occurring, nonessential, neutral amino acid. It is important as a constituent of proteins and as a means of nitrogen transport between tissues. It is "nonessential" because the human body produces its own glutamine.

13. Glutamine is the most abundant free amino acid in human skeletal muscle and plasma.

14. The effects of acute exercise on plasma glutamine appear to be largely dependent on the duration and intensity of exercise.

15. Many healthy people are under the impression, perpetuated by the likes of Defendants here, that a supplemented intake of glutamine has beneficial effects. This is frequently the case among athletes and bodybuilders, who commonly consume glutamine 1 to 3 times daily.

16. Glutamine supplementation doses range from 2 to 40 grams per day, which represents 3% to 60% of the recommended intake of amino nitrogen.

17. Simply because a substance, such as glutamine, is a nutrient, does not necessarily mean that its enhanced use is beneficial. Glutamine naturally found within the body does play a role in certain mechanisms supporting muscle growth and recovery and immunity support.

18. However, as noted in the numerous scientific citations contained herein, glutamine supplementation has been found to be completely ineffective at mimicking these physiological responses.

19. Simply put, the ingestion of Defendants' Product does absolutely nothing for the recovery from exercise or recovery of muscle tissue.

*Defendants' False And Misleading Claims Of The Benefits Of Glutamine*

20. The front of the Product's label clearly states that the Product is the "Ultimate Recovery Fuel" and that the Product "Boosts Post-Workout Recovery":



21. Defendants' recovery claims, however, are blatantly false according to numerous scientific research papers, as contained herein.

22. "Recovery" in bodybuilding is the process of the fatigued muscles to recuperate and grow after resistance training. This process enables the body to undergo muscle growth.

23. In one study, glutamine failed to affect muscle protein kinetics of the test subjects.[1]

24. In a study involving healthy humans, glutamine was continuously infused for 2.5 hours at a rate corresponding to 0.4 grams/kg, which revealed that glutamine supplement did not stimulate muscle protein synthesis.[2]

25. Another study investigated the effect of L-glutamine supplementation on the plasma and muscle tissue glutamine concentrations of exercise-trained rats, both immediately and three hours after a single exercise session until exhaustion. In that study, rats were subjected to 60 minutes of swimming exercise daily for six weeks. During the final three weeks, one group was given a daily dose of L-glutamine (1 gram/kg). The plasma and muscle glutamine levels were higher than placebo during the post-exhaustive recovery period; however, this increase had no effect on the exercise swim test to exhaustion performance, suggesting that elevations in plasma and muscle glutamine levels have no benefit on muscle performance.[3]

26. An additional study was also conducted to assess the effect of oral glutamine supplementation combined with resistance training in young adults. Subjects received either placebo (0.9 grams/kg fat-free mass/day of maltodextrin) or L-glutamine (0.9 grams/kg fat-free

---

[1] Gore D., Wolfe R. Glutamine supplementation fails to affect muscle protein kinetics in critically ill patients. *JPEN J Parenter Enteral Nutr*, 2002, 26:342-49.
[2] Svanberg E., Moller-Loswick A., Matthews D., Korner U., Lundholm K. The effect of glutamine on protein balance and amino acid flux across arm and leg tissues in healthy volunteers. *Clin Physiol*, 2001, 4:478-89.
[3] Rogero M., Tirapequi J., Pedrose R., Castro I., Pires I. Effect of alanyl-glutamine supplementation on plasma and tissue glutamine concentrations in rats submitted to exhaustive exercise. *Nutrition*, 2006, 22:564-71.

mass/day) during six weeks of resistance training. Results showed that muscle strength, torque, fat-free mass, and urinary 3-methyl histidine (a marker of muscle protein degradation) all significantly increased with training, but were not different between the groups. This study demonstrated that L-glutamine supplementation during resistance training had no significant effect on muscle performance, body composition, or muscle protein degradation in young, healthy adults.[4]

27.    Moreover, a study was performed to examine the effects of a combination of effervescent creatine, ribose, and glutamine on muscle strength, endurance, and body composition in resistance-trained men. Subjects performed resistance training while ingesting either placebo or an experimental supplement (5 grams of creatine, 3 grams of glutamine, and 2 grams ribose) for eight weeks. Both groups significantly improved muscle strength, endurance, and fat-free mass, yet the groups were not significantly different from one another. Therefore, the experimental supplement, which included glutamine, was no more effective than placebo in improving skeletal muscle adaptation to resistance training.[5]

28.    Another study sought to determine the effects of eight weeks of creatine monohydrate and glutamine supplementation on body composition and performance measures. Subjects were randomly assigned to receive either placebo for eight weeks, creatine monohydrate (0.3 grams/kg/day for one week and then 0.03 grams/kg/day for seven weeks), or the same dose of creatine in addition to 4 grams of glutamine per day while engaged in a resistance training program. Body mass and fat-free mass increased in the creatine and creatine

---

[4] Candow D., Chilibeck P., Burke D, Davison K., Smith-Palmer T. Effect of glutamine supplementation combined with resistance training in young adults. *Eur J Appl Physiol*, 2001, 86:142-49.
[5] Falk D., Heelan K., Thyfault J., Koch A. Effects of effervescent creatine, ribose, and glutamine supplementation on muscle strength, muscular endurance, and body composition. *J Strength Cond Res*, 2003, 17:810-16.

+ glutamine groups at a greater rate than with placebo. Additionally, the two experimental groups underwent a significantly greater improvement in the initial rate of muscle power production compared to placebo. These results suggest that the creatine and creatine + glutamine groups were equally effective in producing skeletal adaptation to resistance training and that glutamine apparently had no preferential effect in augmenting the results.[6]

29. One study was performed to determine if high-dose glutamine ingestion affected weightlifting performance. In a double-blind, placebo-controlled, crossover study, resistance-trained men performed weightlifting exercises one hour after ingesting placebo (calorie-free fruit juice) or glutamine (0.3 g/kg) mixed with calorie-free fruit juice. Results demonstrated no significant differences in weightlifting performance (maximal repetitions on the bench press and leg press exercises), indicating that the short-term ingestion of glutamine did not enhance weightlifting performance in resistance-trained men.[7]

30. Similarly, another study sought to determine whether glutamine ingestion influenced acid-base balance or improved high-intensity exercise performance. Trained males performed five exercise bouts on a cycle ergometer at 100% of maximal oxygen consumption. The first four bouts were 60 seconds in duration, while the fifth bout was continued to fatigue. Each bout was separated by 60 seconds of recovery. The exercise bouts were initiated 90 minutes after ingesting either placebo or 0.3 grams/kg of glutamine. Results showed that blood pH, bicarbonate, and lactate, along with time to fatigue, were not significantly different between

---

[6] Lehmkuhl M., Malone M., Justice B., Trone G., Pistilli E., Vinci D., Haff E., Kilgore L., Haff G. The effects of 8 weeks of creatine monohydrate and glutamine supplementation on body composition and performance measures. *J Strength Cond Res*, 2003, 17:425-38.

[7] Antonio J., Sanders M, Kalman D., Woodgate D., Street C. The effects of high-dose glutamine ingestion on weightlifting performance. *J Strength Cond Res*, 2002, 16:157-60.

supplement conditions, indicating that the acute ingestion of L-glutamine did not enhance either buffering potential or high-intensity exercise performance in trained males.[8]

31.     Another study determined whether oral glutamine, by itself or in combination with hyperoxia, influenced oxidative metabolism or cycle time-trial performance in men. Subjects ingested either placebo or 0.125 grams/kg of glutamine one hour before completing a brief high-intensity time-trial (approximately four minutes in duration). The results showed no significant difference in pulmonary oxygen uptake during the exercise test, thereby indicating no effect of glutamine ingestion either alone or in combination with hyperoxia. Thus, there was no limiting effect of the tricarboxylic acid intermediate pool size on oxidative metabolism or performance during exercise.[9]

32.     While the front label of Defendants' Product has asterisks after each of the false claims of enhanced recovery, purporting to refer to scientific evidence in support of the claims. the only scientific citation found on the label is *Keast, D.  The Medical Jrnl. of Australia. 1995*, as follows:



---

[8] Haub M., Potteiger J., Nau K., Webster M., Zebas C. Acute L-glutamine ingestion does not improve maximal effort exercise. *J Sports Med Phys Fitness*, 1998, 38:240-44.
[9] Marwood S., Botwell J. No effect of glutamine supplementation and hyperoxia on oxidative metabolism and performance during high-intensity exercise. *J Sports Sci*, 2008, 26:1081-90.

33. But this study only researched the levels of endogenous Glutamine found within the body and the resulting effects of exercise, and not the effects of L-Glutamine supplementation. In fact, none of the study participants ingested supplemental L-Glutamine at all.

34. Defendants thus mislead consumers (1) by extrapolating the effects of naturally occurring endogenous Glutamine, with that of L-Glutamine supplementation; and (2) by citing to a study that does not support the notion that Glutamine supplementation assists in recovery.

35. Plaintiff and the Class purchased and consumed the Product because they believed, based upon the misleading label, that it enhanced muscle growth as well as provided faster recovery.

36. Defendants' labeling of the Product was misleading to Plaintiff and the Class.

37. Plaintiff and Class members were in fact misled by Defendants' representations regarding the efficacy of the Product.

38. The difference between the Product promised and the Product sold is significant. The lack of benefits provided to consumers by the Product fully diminishes the actual value of the Product.

39. Plaintiff and the Class would not have bought Defendants' Product if they had known it did not provide the health benefits as advertised on the label.

40. Defendants' deceptive statements violate 21 U.S.C. § 343(a)(1), which deems food misbranded when the label contains a statement that is "false or misleading in any particular."

41. The United States Food and Drug Administration (the "FDA") promulgated regulations for compliance with the Federal Food, Drug, and Cosmetic Act ("FDCA") and the

Dietary Supplement Health and Education Act (the "DSHEA") at 21 C.F.R. § 101, *et seq*. Defendants' fabricated food Product is misbranded under 21 C.F.R. § 101, *et seq*.

42. Illinois has also expressly adopted the federal food labeling requirements as its own: "[a] federal regulation automatically adopted pursuant to this Act takes effect in this State on the date it becomes effective as a Federal regulation." 410 ILCS 620/21. Thus, a violation of federal food labeling laws is an independent violation of Illinois law and actionable as such.

43. Pursuant to 410 ILCS 620/11, which mirrors 21 U.S.C. § 343(a), "[a] food is misbranded – (a) If its labeling is false or misleading in any particular."

44. The introduction of misbranded food into interstate commerce is prohibited under the FDCA and all state parallel statutes cited in this Complaint.

45. Also, the Illinois Consumer Fraud and Deceptive Business Practices Act also protects Defendants' consumers, and provides:

> § 2. Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2.

46. Plaintiff and Class members would not have purchased the Product, or would have not paid as much for the Product, had they known the truth about the mislabeled and falsely advertised Product.

## CLASS ACTION ALLEGATIONS

47. Plaintiff brings this action individually and as representatives of all those similarly situated, pursuant to Federal Rule of Civil Procedure 23, on behalf of the below-defined Classes:

> **National Class:** All persons in the United States who purchased the Product.
>
> **Consumer Fraud Multi-State Class:** All persons in the States of California, Florida, Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, and Washington who purchased the Product.[10]
>
> **Illinois Subclass:** All persons in the State of Illinois who purchased the Product.

Excluded from the Classes are Defendants and their affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded are any judicial officers presiding over this matter and the members of their immediate families and judicial staff.

48. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

49. **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Classes are so numerous that their individual joinder herein is impracticable. On information and belief, Class members number in the thousands to millions. The precise number of Class members and their addresses are presently unknown to Plaintiff, but may be ascertained from

---

[10] The States in the Consumer Fraud Multi-State Class are limited to those States with similar consumer fraud laws under the facts of this case: California (Cal. Bus. & Prof. Code §17200, *et seq.*); Florida (Fla. Stat. §501.201, *et seq.*); Illinois (815 Ill. Comp. Stat. 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws §445.901, *et seq.*); Minnesota (Minn. Stat. §325F.67, *et seq.*); Missouri (Mo. Rev. Stat. 010, *et seq.*); New Jersey (N.J. Stat. §56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law §349, *et seq.*); and Washington (Wash. Rev. Code §19.86.010, *et seq.*).

Defendants' books and records. Class members may be notified of the pendency of this action by mail, email, Internet postings, and/or publication.

50. **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Such common questions of law or fact include:

   a. Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Product are deceptive;

   b. Whether Defendants' actions violate the State consumer fraud statutes invoked below;

   c. Whether Defendants breached an express warranty to Plaintiff and Class members; and

   d. Whether Defendants were unjustly enriched at the expense of the Plaintiff and Class Members.

51. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and the other Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, are pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

52. **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the claims of the other members of the Classes because, among other things, all Class members were comparably injured through Defendants' uniform misconduct described above. Further, there are no defenses available to Defendants that are unique to Plaintiff.

53. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other Class members he seeks to represent, he has retained counsel competent and experienced in complex class action litigation, and he will prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiff and his counsel.

54. **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a representative class action, members of the Classes would continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue hardship and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendants. The proposed Classes thus satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

55. **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole.

56. **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other members of the Classes are relatively small compared to the burden and expense that would be required to

individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIMS ALLEGED

### COUNT I
### Violation Of State Consumer Fraud Acts
### (On Behalf Of The Multi-State Class)

57. Plaintiff incorporates paragraphs 1 through 56 as if fully set forth herein.

58. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class[11] prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

59. Defendants intended that Plaintiff and each of the other members of the Consumer Fraud Multi-State Class would rely upon their deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

60. As a result of the Defendants' use or employment of unfair or deceptive acts or business practices, Plaintiff and each of the other members of the Consumer Fraud Multi-State Class have sustained damages in an amount to be proven at trial.

---

[11] California (Cal. Bus. & Prof. Code §17200, *et seq.*); Florida (Fla. Stat. §501.201, *et seq.*); Illinois (815 Ill. Comp. Stat. 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws §445.901, *et seq.*); Minnesota (Minn. Stat. §325F.67, *et seq.*); Missouri (Mo. Rev. Stat. 010, *et seq.*); New Jersey (N.J. Stat. §56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law §349, *et seq.*); and Washington (Wash. Rev. Code §19.86.010, *et seq.*).

61. In addition, Defendants' conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

## COUNT II
### Violation Of The Illinois Consumer Fraud Act
### (In The Alternative To Count I And On Behalf Of The Illinois Subclass)

62. Plaintiff incorporates paragraphs 1 through 56 as if fully set forth herein.

63. Plaintiff DeBernardis brings this claim individually and on behalf of members of the Class and Illinois Subclass against Defendants.

64. The Illinois Consumer Fraud and Deceptive Business Practices Act (the "ICFA"), 815 ILCS 505/1, *et seq.*, prohibits the use of unfair or deceptive business practices in the conduct of trade or commerce. The ICFA is to be liberally construed to effectuate its purpose.

65. Defendants' conduct in representing the benefits of its Product constitute the act, use and employment of deception, fraud, false pretenses, false promises, misrepresentation, and unfair practices in the conduct of Defendants' trade or commerce.

66. Defendants intended that Plaintiff and the Class Members would rely on their representations. The sole purpose of glutamine is its supposed ability to assist in recovery from exercise, enhance muscle recovery, as well as have anti-catabolic properties, and Defendants intended to prey on these misconceptions.

67. The recovery misrepresentations are material because they concern the type of information upon which a reasonable consumer would be expected to rely in making a decision whether to purchase the Product.

68. Because Defendants are in the business of selling supplement products, Defendants committed the unfair and deceptive acts in the conduct of their trade and commerce.

69. Defendants' practice of misrepresenting the Product is also unfair because it offends public policy and is immoral, unethical, and unscrupulous because Illinois consumers are being misled about the very efficacy and purpose of the Product. Misrepresenting the Product offends the public's expectation to be told the truth about the products they are buying.

70. Defendants' conduct also causes substantial injury to consumers. Not only are consumers being misled into purchasing a Product that is not what it is represented to be, but consumers are paying for and ingesting a Product with absolutely no value or benefit.

71. Because the Product has no efficacy, the Product as sold was worth less than the Product as represented, and Plaintiff and Class Members paid a premium for it. Had the truth be known, Plaintiff and Class Members would not have purchased the Product or would have paid less for it.

72. Plaintiff and Class Members were deceived by the labeling on the Product and suffered economic damages as a proximate result of Defendants' unlawful conduct as alleged herein, including the difference between the actual value of the Product and the value of the Product if it had been as represented.

73. Defendants' conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

74. Plaintiff also seeks to enjoin Defendants' ongoing deceptive practices relating to its claims on the Product's labels and advertising.

### COUNT III
### Breach Of Express Warranty
### (On Behalf Of The National Class)

75. Plaintiff incorporates paragraphs 1 through 56 as if fully set forth herein.

76. Plaintiff, and each member of the National Class, formed a contract with Defendants at the time Plaintiff and the other members of the National Class purchased the Product. The terms of the contract included the promises and affirmations of fact made by Defendants on the Product's packaging and through marketing and advertising, as described above. This labeling, marketing and advertising constitute express warranties and became part of the basis of bargain, and are part of the standardized contract between Plaintiff and the members of the National Class and Defendants.

77. Plaintiff and the National Class performed all conditions precedent to Defendants' liability under this contract when they purchased the Product.

78. Defendants breached express warranties about the Product and its qualities because Defendants' statements about the Product were false and the Product does not conform to Defendants' affirmations and promises described above.

79. Plaintiff and each of the members of the National Class would not have purchased the Product had they known the true nature of the Product.

80. As a result of Defendants' breach of warranty, Plaintiff and each of the members of the National Class have been damaged in the amount of the purchase price of the Product and any consequential damages resulting from their purchases.

**COUNT IV**
**Unjust Enrichment**
**(In The Alternative To Count III And On Behalf Of The National Class)**

81. Plaintiff incorporates paragraphs 1 through 56 as if fully set forth herein.

82. Plaintiff and the other members of the National Class conferred benefits on Defendants by purchasing the Product.

83. Defendants have been unjustly enriched in retaining the revenues derived from Plaintiff's and the other members of the National Class' purchase of the Product. Retention of those monies under these circumstances is unjust and inequitable because Defendants' labeling of the Product was misleading to consumers, which caused injuries to Plaintiff and the other members of the National Class because they would have not purchased the Product if the true facts would have been known.

84. Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiff and the other members of the National Class is unjust and inequitable, Defendants must pay restitution to Plaintiff and the other members of the National Class for their unjust enrichment, as ordered by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff and the other Class members respectfully request that the Court:

A. Certify the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Award damages, including compensatory, exemplary, statutory, incidental, consequential, actual, and punitive damages to Plaintiff and the Classes in an amount to be determined at trial;

C. Award Plaintiff and the Classes their expenses and costs of the suit, pre-judgment interest, post-judgment interest, and reasonable attorneys' fees;

D. Grant restitution to Plaintiff and the Classes and require Defendants to disgorge its ill-gotten gains;

E. Permanently enjoin Defendants from engaging in the unlawful conduct set forth herein; and

F. Grant any and all such other relief as the Court deems appropriate.

Dated: August 23, 2017

Respectfully submitted,

By: */s/ Richard S. Wilson*
Richard L. Miller II
*rmiller@siprut.com*
Richard S. Wilson
*rwilson@siprut.com*
Natasha Singh
*nsingh@siprut.com*
**SIPRUT PC**
17 North State Street
Suite 1600
Chicago, Illinois 60602
Phone: 312.236.0000
Fax: 312.878.1342

Nick Suciu III
*nicksuciu@bmslawyers.com*
**BARBAT, MANSOUR & SUCIU PLLC**
1644 Bracken Road
Bloomfield Hills, Michigan 48302
Phone: 313.303.3472

*Counsel For Plaintiff*
*And The Proposed Putative Classes*